**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 12, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

SONYA VIGIL; LOREN VIGIL,

Plaintiffs-Appellants,

v.

SOUTH VALLEY ACADEMY;
ALAN MARKS, in his official and
individual capacity; DANIEL
DOMINGUEZ, in his official and
individual capacity; KATARINA
SANDOVAL, in her official and
individual capacity,

Defendants-Appellees.

No. 06-2309
(D.C. No. CIV-05-1142 WJ/ACT)
(D. N.M.)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, Chief Judge, **MURPHY** and **HOLMES**, Circuit Judges.

---

Sonya Vigil worked as the office manager for South Valley Academy

(SVA), a school located in New Mexico. Her husband, Loren Vigil, served on

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

SVA's governing council. Both Mr. and Ms. Vigil claim they were forced from their jobs in violation of state and federal law, and they therefore brought this action against SVA and individual defendants Alan Marks, Katarina Sandoval, and Daniel Dominguez. The district court, however, granted SVA's motion for summary judgment and the individual defendants' request for qualified immunity. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 and affirm.

**I**

According to the complaint, SVA is organized as a municipal corporation. In 2001, Ms. Vigil began working for SVA, but complained after completing her first year that she had not been evaluated or given a raise. She also expressed concern about the school's security measures and what she perceived to be the administration's preferential treatment of certain staff members. Later, Ms. Vigil lodged additional complaints that faculty members were working without proper certifications and that she had been denied the opportunity to enroll in further schooling as promised at the time of her hire. The school's head teacher, Alan Marks, told Ms. Vigil that a budget shortfall was to blame for her not receiving a raise, although he later said it was because she lacked certification. Mr. Marks also agreed to hire a security guard, but then delegated the responsibility to a janitor who had no experience with security issues. By 2004, Ms. Vigil had been assaulted by a student and confronted by another wielding a knife; she also learned that a special education teacher was hired during the budget deficit.

Dissatisfied with the manner in which her complaints had been handled, Ms. Vigil's relationship with Mr. Marks and SVA's assistant head teacher, Katarina Sandoval, deteriorated. Ms. Vigil requested a leave of absence for medical reasons, but was told that no such option existed. Rather, Mr. Marks informed her that if she left, she would be paid until February 15, 2004, as severance. Ms. Vigil left despite this warning and never returned to work. Although the parties attempted to mediate the terms of her departure, those efforts failed. Consequently, in March of the same year, the president of the governing council, Daniel Dominguez, asked Mr. Vigil to resign "due to the potential legal implications that may be brought by [Ms. Vigil]." Aplt. App. at 15. Mr. Vigil refused to voluntarily resign and so the council's members voted him out.

The Vigils then brought their grievance to federal court, alleging numerous state and federal violations against SVA and the individual defendants. After the district court dismissed several of the Vigils' claims, the court granted summary judgment based on qualified immunity on the Vigils' remaining claims for freedom of association and Ms. Vigil's claims for freedom of speech, procedural due process, and equal protection. The district court's grant of summary judgment based on qualified immunity is now the subject of this appeal.[1]

---

[1] The district court also granted summary judgment on various contract claims, but the Vigils do not appeal that ruling.

## II

### A. Qualified Immunity

"Qualified immunity generally shields from liability for civil damages government officials performing discretionary functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir.) (internal quotation marks and alteration omitted), *cert. denied*, 127 S. Ct. 676 (2006). "Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Ward v. Anderson*, – F.3d – , 2007 WL 2110901, at *3 (10th Cir. July 24, 2007) (quotation omitted). When a defendant raises qualified immunity as an affirmative defense on a motion for summary judgment, "the plaintiff bears the heavy two-part burden of demonstrating that (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged conduct." *Reeves v. Churchich*, 484 F.3d 1244, 1250 (10th Cir. 2007). If a plaintiff meets this burden, the defendant must then satisfy the usual summary judgment standard of showing that no material facts are in dispute and that he or she is entitled to judgment as a matter of law. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). We review the grant of summary judgment based on qualified

immunity de novo, "considering all evidence in the light most favorable to the non-moving party." *Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006).

In this case, Ms. Vigil alleged that she was terminated. The district court, however, found that she resigned. The court then relied on this finding throughout its qualified immunity analysis to determine that no constitutional violations had occurred. Yet, our precedent required the court to accept as true her allegation that she was terminated. *See Lawrence v. Reed*, 406 F.3d 1224, 1230 (10th Cir. 2005) (holding that qualified immunity analysis begins with the court asking "whether the plaintiff's allegations, if true, establish a constitutional violation" (internal quotation marks omitted)). By finding that Ms. Vigil resigned and incorporating that finding into its qualified immunity analysis, the district court blended its qualified immunity analysis with a merits analysis and improperly undercut Ms. Vigil's claims. Instead, the court should have accepted as true Ms. Vigil's allegation that she was terminated and determined whether, based on that or any other allegation, she established a constitutional violation. Therefore, given our de novo standard of review, and because "[w]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law," *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001), we accept Ms. Vigil's allegation that she was terminated and proceed to consider whether there is any merit to the contentions now before us.

### 1.  Freedom of Association

The First Amendment implicitly protects the freedom to expressive association.  *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 658 (10th Cir. 2006).  Although there has been some debate as to its source, the right to familial association also is constitutionally protected.  *See Trujillo v. Bd. of County Comm'rs*, 768 F.2d 1186, 1188-89, 1190 n.7 (10th Cir. 1985).  A plaintiff alleging a violation of the right to expressive association may support his or her claim by demonstrating, *inter alia*, some form of government action to impose penalties for the expression of political views, *see Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984), while a plaintiff claiming a violation of the right to familial association must show that the defendant had the specific intent to interfere with the familial relationship, *Trujillo*, 768 F.2d at 1190.

Here, the Vigils maintain that their rights to expressive and familial association were violated when the individual defendants punished them for their political views and their marriage to one another.  They fail to present, however, any specific evidence to support these allegations.  With respect to Ms. Vigil, the record supports neither her argument that she was fired for expressing concerns about proper faculty certification, inequitable treatment, and safety issues, nor her argument that she was fired for sharing views common with her husband.  Rather, the record suggests that she was fired because she took an unauthorized leave of absence.  Indeed, Mr. Marks warned Ms. Vigil prior to her departure that she

would be compensated "until February 15, 2004 as severance pay." Aplt. App. at 117. This warning signaled to Ms. Vigil that her unauthorized leave of absence would result in termination because she later acknowledged that if she were not paid while on medical leave, it could "only be taken as a statement that I have been fired." *Id.* at 128. Moreover, she specifically disputed the implication of Mr. Marks' statement, arguing that "[p]ay received while on medical leave cannot be considered severance pay." *Id.* And despite Ms. Vigil's growing frustration and repeated threats of resignation, it was not until after she took an unauthorized leave of absence that SVA refused to allow her back.

As for Mr. Vigil, the evidence concerning his removal shows not that he was punished for his wife's actions, but because there were "obvious conflict of interest issues involved with the actions [she was] taking." *Id.* at 136. Both Mr. Marks and Ms. Sandoval were governing council members and both were enmeshed in a dispute that now names them as defendants. Mediation had proven unsuccessful, Ms. Vigil had threatened legal action, and the council was caught in the unenviable position of forcing Mr. Vigil to resign or allowing him the choice to either engage in or abstain from proceedings necessarily implicating his wife. Given these circumstances, the fact that the council forced him to resign does not indicate an intent to punish him for any political views he may have expressed. Nor does it evidence a specific intent to interfere with his marriage. It shows only that the council sought to avoid the conflict of interest that clearly existed.

Accordingly, because Mr. and Ms. Vigil fail to show a violation of their rights to expressive or familial association, they cannot satisfy the first prong necessary to overcome a qualified immunity defense, and we therefore need not consider the second. *See Eaton v. Meneley*, 379 F.3d 949, 954 (10th Cir. 2004) ("But if a plaintiff fails to demonstrate that a defendant's conduct violated the law, the court need not determine whether the law was clearly established.").

### 2. Freedom of Speech

Turning to Ms. Vigil's individual claims, she maintains that she was terminated in retaliation for speaking out against inequitable staff treatment, unethical employment practices, and inadequate security measures at SVA. "[T]he First Amendment bars retaliation for protected speech." *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998). In *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006), the Supreme Court recently altered the traditional free speech retaliation claim analysis set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968). *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007) ("it is apparent that the '*Pickering*' analysis of freedom of speech retaliation claims is a five step inquiry which we now refer to as the '*Garcetti/Pickering*' analysis"); *see also Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1325 (10th Cir. 2007) (noting that *Garcetti* "profoundly alters how courts review First Amendment retaliation claims"). We now begin by asking whether the employee spoke "pursuant to [her] official duties." *Garcetti*,

126 S. Ct. at 1960. Public employees who speak pursuant to their official duties are afforded "no constitutional protection because the restriction on speech simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Brammer-Hoelter*, 492 F.3d at 1202 (internal quotation marks omitted). Next, if the employee has not spoken pursuant to her official duties, but rather as a citizen, we must determine whether the speech relates to a matter of public concern. *See Green v. Bd. of County Comm'rs*, 472 F.3d 794, 798 (10th Cir. 2007). Speech that is of no public concern is not protected and the inquiry ends. However, once it is determined that the employee has spoken as a citizen on a matter of public concern, we ask "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer." *Casey*, 473 F.3d at 1327 (internal quotation marks omitted). If the employee's interest is greater than that of the employer, she must then show that the speech was a motivating factor behind the adverse employment decision. *Belcher v. City of McAlester*, 324 F.3d 1203, 1207 (10th Cir. 2003) (quotation omitted). Finally, if an employee makes this showing, the employer may demonstrate by a preponderance of the evidence that its action would have been the same toward the employee even without the protected speech. *Id.*

In this case, Ms. Vigil's claim does not survive beyond the first two steps. With respect to whether she spoke pursuant to her official duties, although Ms. Vigil insists that it was not her "job responsibility" to report wrongdoing,

Aplt. Br. at 35, "[a]n employee's official job description is not dispositive," *Brammer-Hoelter*, 492 F.3d at 1203. Rather, "[t]he ultimate question is whether the employee speaks as a citizen or . . . in his or her professional capacity." *Id.* (internal quotation marks omitted). And on this score, Ms. Vigil's complaints of falsely reported student statistics clearly were made in her professional capacity as office manager because she was the one charged with filing these reports.

As for the remainder of her speech, it does not relate to matters of public concern. Ms. Vigil's complaints that the administration favored certain staff members, failed to evaluate her performance and increase her salary, and hired a new teacher during the budget deficit are not matters of public concern because they are "internal in scope and personal in nature." *Id.* at 1206 (internal quotation marks omitted). Further, even if her statements about the school's inadequate security measures were sufficiently related to matters of public concern, there is absolutely no evidence that she was fired for voicing this concern. Thus, Ms. Vigil fails to advance a viable free speech retaliation claim, and the individual defendants are entitled to qualified immunity.

**3. Procedural Due Process**

Next, Ms. Vigil asserts that she was denied due process because she was terminated without notice. "Procedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision." *Kirkland v. St. Vrain Valley Sch. Dist.*, 464 F.3d 1182,

1189 (10th Cir. 2006) (quotation omitted). In deciding whether a plaintiff was denied procedural due process, we ask first, whether she possessed a protected interest to which due process protection was applicable; and second, whether she was afforded an appropriate level of process. *Id.*

In Ms. Vigil's case, she was employed under a binding contract until June 30, 2004, and therefore had a protected property interest in continued employment until that date. *See Dill v. City of Edmond*, 155 F.3d 1193, 1206 (10th Cir. 1998) ("Protected property interests arise, not from the Constitution, but from state statutes, regulations, city ordinances, and express or implied contracts."). Her contract, however, expressly provided that it could "be terminated by the School for cause, including . . . insubordination . . . physical or mental inability to perform the required duties or for any other good and just cause . . . ." Aplt. App. at 66.

Ms. Vigil argues that she took a leave of absence for medical reasons, notwithstanding Mr. Marks' warning that no such form of leave existed. Thus, under the express terms of her contract, her inability to perform the duties required of her and the fact that she took leave without authorization provided the school with just cause to terminate her contract. Moreover, the fact that Ms. Vigil negotiated the circumstances of her departure during mediation clearly establishes that she received adequate due process. Consequently, we conclude that Ms. Vigil's claim is without merit.

-11-

## 4. Equal Protection

Ms. Vigil also contends that she was treated differently from similarly situated employees because she was not allowed to attend further schooling, receive pay raises, take medical leave, or arrive late to work without reprimand. Quoting our decision in *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 849 (10th Cir. 2005), she asserts that this disparate treatment constituted a "campaign of official harassment directed against her out of sheer malice." Aplt. Br. at 46 (alteration omitted).

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). Although Ms. Vigil does not claim to be a member of a protected class, she may bring an equal protection claim as a "class of one" by proving that she was "singled out for persecution due to some animosity . . . wholly unrelated to any legitimate state activity." *Mimics, Inc.*, 394 F.3d at 848-49 (quotations and citation omitted).

Ms. Vigil's claim is wholly without merit. Initially, we think her comparison to *Mimics, Inc.* is ill-conceived. In that case, we found that the plaintiffs were selectively targeted and treated differently from others similarly situated due to their alignment with an opposing political faction. *Id.* at 849.

-12-

That conclusion was based on specific evidence that the defendant building inspector twice entered the plaintiffs' place of business without authorization. *Id.* at 843-44, 847 n.5.

Here, by contrast, Ms. Vigil offers no evidence to suggest that she was singled out for illegitimate reasons. Instead, we note that the individual defendants have legitimate interests in regulating faculty development, the use of medical leave, and the provision of salary increases. They also have a legitimate interest in ensuring that their staff is punctual. Further, although Ms. Vigil asserts that unlike other employees, she was not allowed to have summers off, pursue additional schooling, receive pay raises, take medical leave, or arrive late to work without penalty, she fails to demonstrate that she was similarly situated to these other employees. "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (quotation omitted). Ms. Vigil likens herself to other staff members by virtue of the fact that they all answered to Mr. Marks, but she fails to demonstrate that they were subject to the same performance and disciplinary standards. Therefore, because Ms. Vigil has not shown that she was similarly situated and cannot show that she was singled out for illegitimate reasons, her equal protection claim fails.

## B. Summary Judgment For SVA

Finally, we consider whether liability may be imposed on SVA, which, as an entity defendant, is not eligible for qualified immunity. We review the grant of summary judgment de novo, applying the same legal standard as the district court. *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1214 (10th Cir. 2002). We have previously held that municipal liability may not be imposed on an entity defendant where individual defendants are found to have committed no constitutional violation. *See Butler v. City of Prairie Village*, 172 F.3d 736, 747 (10th Cir. 1999) ("Because our conclusion that the individual defendants are entitled to qualified immunity rests on the determination that none of them violated Plaintiff's constitutional rights, the City may not be found to have violated his rights."); *Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir. 1996) (quotation omitted) ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers."). Our conclusion here that the individual defendants committed no constitutional violation therefore precludes a finding of liability against SVA. Accordingly, SVA was entitled to summary judgment.

The judgment of the district court is AFFIRMED.

Entered for the Court

Jerome A. Holmes
Circuit Judge

-14-